Gregorio Vatelis de Leon v. John Ashcroft Does the clock need to be increased, sir? Good morning. May it please the Court? I'm Charles Nickel for the Petitioner. On June 3rd, 2002, the Petitioner applied for adjustment of status based upon the application of a U.S. citizen wife and — When was that date? June 3rd, 2002, that he attended the interview. In conjunction with that application, the Petitioner intended to make an application for admission after deportation, which would be an I-212 waiver. The I.N.S. mistakenly believed that the Petitioner had an outstanding order of deportation from December 5, 1991, and that the I.N.S. took the Petitioner into custody at that time for the purpose of executing that order. On that basis, the I.N.S. rejected the adjustment of status application, and Petitioner was not afforded an opportunity to apply for an I-212 waiver because the I.N.S. at that time had not conceded that he, in fact, had reentered after deportation. Then four days later, after reviewing the evidence submitted by the Petitioner to prove that he had, in fact, had departed the U.S. in October of 1997 for a two-day trip to Vancouver, Canada, the I.N.S. acknowledged that the Petitioner had, in fact, self-deported. However, rather than adjudicate the adjustment of status application, which was properly filed under the provisions of Section 245i, the service decided to simply reinstate the order of deportation under the reinstate provisions of INA Section 241a-5. Now, the bar under 241a-5, there are certain exceptions to that bar. This Court in Castro-Cortez v. I.N.S. held that the reinstatement provisions do not apply to aliens who were deported and reentered prior to April 1, 1997, which was the effective date of enactment of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996. The bar does not apply to Nicaraguan and El Salvadoran applicants for adjustment of status under the Nicaraguan and Central American Relief Act of NACARA. Recently, this Court, in the decision of Padilla v. Ashcroft, decided on July 1, 2003, there's a concurrent opinion in that decision which notes that 245a-5, it does not address the government's authority to refrain from reinstatement and removal while a potentially meritorious application for adjustment of status is pending. And it was also noted that it's not clear that 245a-5, 241a-5 was meant to apply to adjustment of status applications filed under the LIFE Act, under the Legal Immigration Family Equity Act, which is INA section 245i, which permits certain aliens who entered the United States illegally and have remained in unlawful status to pay a one-time $1,000 fine and proceed with an adjustment of status application. Mr. DeLeon did apply under the LIFE Act. He paid the $1,000 penalty and the other $355 for the application. In Prado v. Reno, which is 86 F. Sup. 1037, Western District of Washington, the Court held that the INA can and should consider on its merits a fully perfected application for adjustment of status filed before reinstatement proceedings are instigated. Also in Prado v. Hernandez, the Court noted that the absence of section the absence of section 245i of a Croft reference to section 245a-5, which is the reinstatement bar, or other significant language barring adjustment to aliens who illegally re-enter after deportation, is significant in light of the numerous other limitations and statutory cross-references in INA section 245 and in INA section 245i in particular. It is noted that the reinstatement provision is silent about how prior applications for adjustment of status, this is from the Court's decision in Padilla, are to be treated. The legislative history of IHRA suggests a concern with applications filed after, not before, prior orders of reinstate or prior orders are reinstated. So I don't quite understand. This administrative process is a difficult one to understand unless you're immersed into it every day. Right. And I'm certainly not. I consider myself one who's immersed deeply into the INS. A lab breath of procedures and whatnot. But as I understand this whole problem here, they use this reinstatement order to affect his removal. Right. Okay. And your contention is that it should not apply when he has a rea an adjustment application pending under the LIFE Act? Is that the argument? Yes. And they should first adjudicate. I mean, in the statute it says they can apply the reinstatement if the service chooses to reinstate a prior order of deportation. The person cannot submit any applications for relief. Right. Well, here we have an application that was pending prior to the reinstatement order. I mean, the adjustment application was properly filed. The service should have reviewed the application prior to issuing the reinstatement order. And that's, you know, that's also. I'm sorry. How do you how do you I don't quite understand how you get there. He I thought, to be honest with you, I wasn't maybe I didn't quite follow your brief, but I thought you were raising some sort of retroactivity issue here. Well, that was later addressed in with respect to the deport, you know, the timing of the deportation order. Right. The deportation. We're not it's not like an Alvarenga where they're questioning the actual deportation order. He he he accepted voluntary departure. And he never applied for any form of relief other than voluntary departure. And he was granted that, and he he did not depart. And when he did not depart, that turned automatically into an order of deportation. Now, subsequently, years later, he did depart, and that was effectively a self-deport. And that was after the effective date of IRIRC. Yeah. It was a reentry. It was after IRIRC. So IRIRC came in April 1st of 97. So it was after. So it was different than Castro-Cortez, where the person left and then reentered prior to the effective date of IRIRC. Now, here he did reenter afterwards, and he applied under the LIFE Act, which, you know, makes, you know, many provisions for people who are here in an unlawful status. In Padilla, you know, they mentioned that the retroactivity argument that it should not apply, the reinstatement provision should not apply retroactively to an adjustment to a situation where an adjustment of status application is already pending. And the argument is not that it should not apply retroactively to a deportation order that was entered prior to the effective date of IRIRC. Well, we've made the argument that it should not apply retroactively to a case to a deportation order that was issued prior to the effective date of IRIRC. That's one issue. And the second one is the way the statute is worded, they say that once we reinstate a prior order, you can't apply for anything. But how — it doesn't really say how that would affect an adjustment application which is pending prior to instigating the reinstatement provisions. And with all of the emphasis the government has had on family unity, on, you know, the provisions for suspension of deportation, for the — the LIFE Act is basically a form of family unity for people who are not in lawful status, who have no other means of — So are you saying they can't use — they can't use the reinstatement process when there's a pending application? I think they should have to adjudicate the application for adjustment of status first. And then they hold the whole reinstatement process in abeyance? In abeyance prior to — because where an application is properly filed — Who adjudicates the application for adjustment of status? How does that get adjudicated? The service. The service does? Here the court — But how long does that take? From the time they apply to the time that they get an interview. It's taking about eight months right now. You file for the adjustment and then by the time you actually get to the interview, it would be about an eight-month period. Now, you know, here the application was served. They may have allowed him to go forward with the application and have the Act 212 waiver, had they not realized — We have a question for you. I'm sorry. Well, am I hearing you say that the reinstatement order isn't self-executing, that there isn't really a reinstatement of the order of deportation until the service gets around to executing the paraphernalia to carry it out? And it was in this period of time before they did that that he has to have his status adjusted? And so in this sort of limbo period, he might have to have his status adjusted before the paraphernalia gets moved forward? It seems to me that that reinstatement occurs the moment he comes into the country, but that's precedent is — The reinstatement is a determination which is made by the service, whether or not they're going to reinstate the prior order. In fact, as I noticed in Padilla, there's no — they mentioned that the reinstatement provisions, they don't address the government's authority to refrain from reinstatement while there's, you know, an application pending before it. And it's nothing to say that they're not required to adjudicate a — what is a potentially meritorious application for adjustment. Now, the application for adjustment is discretionary. They can deny that. They can review the application for the I-212 waiver for having reentered after deportation. But they should do that before they reinstate. And the reinstatement statute itself is — it's for once we reinstate a prior order, you can't apply for anything. It doesn't say you're precluded from applying prior to the order of reinstatement. Well, I'm just a little bit concerned about how you would — how you would effectuate that. That is, don't they have some discretion about whether or not they're going to utilize the administrative reinstatement process? I guess they could have said — I guess they could have said here on their own, they could have said, we're not going to — we won't reinstate the prior order, we'll just — we'll just initiate new proceedings or we'll — we'll just wait. Right? They could, but — I mean, here, if he had been taken into custody, if he had been, you know, walking down the street after having reentered in 97 and he's stopped for whatever reason and he's found, hey, you have a prior order of deportation, take him into custody and immediately remove him, he can't at that time say, wait, I'm married to a United States citizen, I've got an approved visa petition, I want to apply for adjustment. Because they've already decided — they've issued an order of reinstatement against him and say, you precluded under the Act. But here, the application for adjustment was filed prior to the instigation of — or the initiation of — of reinstatement by the service. And, you know, under that, he had a — he had a meritorious application for adjustment pending, which he should have a right to have that adjudicated. I'd like to reserve my time if there's no further questions. Thank you. Your Honor, we — So tell me, how can you help this guy out? I don't think I can, Your Honor. Why not? Because this Court's decisions in Padilla and Gallo-Alvarez control this case. It appears that the petitioner's theory has shifted. His brief does not raise the adjustment of status argument that he's made in this — in this argument. If you look at our last footnote in our brief, footnote number 13, we anticipate that he has not sufficiently raised that argument in his brief. However, even — The one he just made? The one he just made. His arguments in his brief — What footnote was that, 13? 13, the last page. His footnotes, as I understand them — I'm sorry. His arguments, as I understand them in his brief, are, one, that reinstatement doesn't apply because this is reinstatement of a deportation order, and, two, that even if it does apply, it's unconstitutional. Those are the primary issues in the case that — that are controlled by this Circuit's precedent. But I would say, Your Honor, even if the Court were to entertain his primary argument, it's foreclosed by this Circuit's decision in Padilla, which addressed precisely that issue. The petitioner quotes from Padilla in the concurring opinion by Judge Berzon, but the majority's opinion involves the exact same factual situation. An alien had a pending adjustment application and went in for the interview. The INS discovered the prior deportation and reinstated, and the Court held that the petitioner was ineligible for adjustment of status. I would note that there is no retro — Ineligible? To apply for adjustment of status. Ineligible. Ineligible. Ineligible, based on the reinstatement statutes bar on, quote, any relief. So Padilla would control the case. I would note also, in terms of retroactivity concerns, that there are none, because this case involves an alien who — whose deportation and illegal reentry occurred after the statute was passed and after the effective date, which was — I hope they rely on a deportation order prior to the effective date. That's true, Your Honor. But I'm discussing the retroactivity issue even with regard to the application for discretionary relief. If there's any — as I understand it, they were trying — the petitioner was trying to make an argument that if it's pending before reinstatement, it's impermissibly retroactive if the application is pending. However, they were on notice at the time that they were deported and illegally reentered that an illegal reentry would bar that individual from any relief. But he was also making a retroactivity argument that the reinstatement provision should not apply to — Yes. — to deportation orders issued prior to the effective date of IRIRA. That's correct. He does make that argument. It's brief. And we — What's wrong with that argument? Well, it's — the first problem is it's foreclosed by circuit precedent in Gallo-Alvarez. The Court very clearly stated that Section 1231A5 applies to a deportation order that was involved. But they didn't really — the Court didn't really go through careful land graph analysis, did it? It did not, Your Honor. But I just — Why is that — why is that — what case was that? Gallo-Alvarez. Right. Hold on just a second. Yes, Your Honor. Wait one second. Gallo-Alvarez. Page 1129. Hold on. What they said — what we said in Gallo-Alvarez was — Gallo-Alvarez was, furthermore, it applies to situations meaning reinstatement, applies to situations in which the predicate order of deportation was entered prior to the 1996 revisions of the immigration law. And then they say C. Tapia — Mendez-Tapia, which was a district court habeas petition. Yes, Your Honor. Now, there is no discussion in that one sentence that in any way addresses the complex retroactivity issues. And our circuit law says that just a reference to a point of law without analysis is not binding on a subsequent panel. Your Honor, the — all the circuits, as we've set forth in our brief to address this question, have applied it to deportation orders based on this provision. It's Section 309D2 of IRERA, which states that order of removal refers to an order of deportation and order of exclusion. If we look at the Gallo-Alvarez decision, it not only states what Your Honor just mentioned, but it also, in footnote 3, specifically notes that although the provision referring to the reinstatement statute refers to removal, this also applies to orders of deportation. So it invokes the Section 309D2 statute in footnote number 3 at page 1129 to address that question. There's some analysis involved, and that's the provision which all of the — all of the circuits have been relying on to — to sustain or to affirm. Wait, wait, wait. You're looking at footnote 3? I believe it's footnote 3, Your Honor. At least that's the provision refers to removal. This also applies to orders of deportation. That's right. It's citing — citing 309D2. Your Honor, the other point I'd make on that is that the relevant regulation, the implementing regulation — You know, I was on that panel, and I don't think, certainly don't believe we intended to be — to have it read the way you're reading it. Well, Your Honor, that involved a deportation order. I know there's not an abundant amount of analysis, but there is some discussion, and certainly of citation 309D2. I would also point the Court to the fact that the relevant regulation in this case, the reinstatement regulation, which is at 8 CFR section 241.8, refers to — encompasses orders of deportation, and that's entitled to some deference. I would point the Court as well to the Fourth Circuit's decision, which we've cited, Velazquez-Gabriel, which actually engages in a more lengthy discussion about this issue, and several other circuits have held the same way and cited to it. So I think that is foreclosed. Certainly, if not — if the Court gets to the Landgraf retroactivity analysis, we think that it's clearly governed by the statute. But if it gets to the Landgraf analysis, there's no real argument that the Petitioner has set forth saying that such an application would be impermissibly retroactive. Simply because it's a deportation order rather than a removal order, there's no — like St. Cyr, Supreme Court decision in St. Cyr, there's no expectations being upset here. The Petitioner was fully on knowledge at the time of his — not only his illegal reentry, but at the time of his deportation, that the statute was in existence. This is — you're right. We do have circuit law that interprets removal to encompass deportation. But the argument that I understand it to be making is that it's more like a St. Cyr kind of argument. That we're making, Your Honor? No, that the Petitioner is making. That's — that's what I understand from the brief, but I'm not sure I understand what is the retroactive effect, as there was in St. Cyr, the Supreme Court held here. They're not giving up. I'm not sure what they're giving up. Well, he voluntarily departed. After the — after the statute was passed and after it had taken effect. So — Well, at his deportation hearing, he agreed to a voluntary departure, correct? That — way back in 1990, that's right. Right. But he didn't — he didn't depart. He stayed in the country. Right. So when he stayed in the — when he didn't depart, that was — was this the case where he had one year to depart? I can't remember. I believe he had a lengthy period of time and failed to depart. And he failed to depart. And then — and then his — then his failure to — and then I guess there was a formal order of deportation when he didn't depart. That's right. Right. And that occurred before the effective date of arrival. That's right. Right. That was the — that was the deportation order. That's right. So he didn't appeal. He volunteered. He agreed to the voluntary departure. And he essentially — what he — what happens is he gives up his rights, turns out, as it — as it turns out down the line, that if he comes back in illegally, or if he comes back in again, he gives up his right to apply for — there's no possibility for him to apply for any kind of relief. I don't know. I'm not sure I understand. I mean, at the time he left, the statute was in existence. So he — he — so he volunteered. I mean, he didn't — he could have moved to Rio and applied for — Let me ask you this. Let me ask you this. If the service initiated removal proceedings against him instead of reinstatement proceedings against him, he could have sought some discretionary relief, correct, such as cancellation of removal? I'm — I'm not sure he would have been eligible. I'm just hypothetically speaking. Yes. He would have — he would have — Or he could have applied for adjustment of status. Right. Right? Yes. If he was eligible otherwise. If he wouldn't be — in other words, he wouldn't have been barred by the reinstatement statute if he had been put into a removal proceeding, although he — if it wasn't a legal reentry, that question is not — it's not clear, because he would have had a legal reentry, and so the immigration judge may have interpreted the reinstatement statute to bar him from relief. But there was no — but there's — everything happened — and I'm out of time. I'll just finish. Everything happened, it seems to me, except for his original deportation order, the turning of the deportation order. Everything else happened. Anything that he could have done, you know, his — his departure and his coming back in happened after the reinstatement statute's effective date. So I'm not sure that he gave up anything. I mean, you know, he lost something, obviously. What did — what did Mr. St. Cyr give up? He gave up his right to a constitutional defense, to his — With the expectation of what? With the expectation that he was going to have 212c relief. That he might be able to apply for 212c relief. That he might be able to apply for 212c. There's no guarantee. It was just a possibility that he could apply for a 212c relief. Right. But he — but here, the Petitioner didn't give up anything. He didn't give up anything. He didn't pursue an appeal. He didn't — he didn't — he didn't — he just agreed to involuntary departure. But — but he didn't — the fact that he — he didn't pursue an appeal was not predicated on the existence of discretionary relief. That doesn't make — I mean, he — he didn't pursue an appeal because he — he didn't have any defense. And he — and he — there was an order entered against him and — well, his voluntary departure. So he didn't — his — his decision not to appeal wasn't predicated on anything. So we would ask that this Court would follow its decision in Gallo-Alvarez and affirm the reinstatement order. Thank you. Thank you. We'll just note that in — in Gallo-Alvarez, the Court says that we do not reach the question as to the constitutionality of the reinstatement provision. It's on the first page. And at the end of the case, which was order transferred, said because of the factual inquiry that Section 1231A5 does not apply in this instance, we don't have to reach the question of whether the summary reinstatement provisions of the statute are unconstitutional. So I don't know that would — that Gallo-Alvarez completely closes the door on a challenge to whether the retroactive application of the reinstatement provisions comport with due process. And in this instance, when he was — on December 5, 1990, he simply took a year of voluntary departure and didn't — didn't challenge that. That expired and turned into an order of deportation. Subsequently to that, he got married. At the time that he got married, the — he could have — and that she filed a relative a petition for him, which was prior to the IRA-IRA. He could have departed, come back in, asked for a waiver of the — of the reentry. So the reactions that he took and, you know, which would be predicated on belief in a form of relief being available to him, he departed. And when he applied for adjustment of status, he believed that having left the United States and reentered, he would be able to apply for an I-212 waiver. Where did he get that advice? I wasn't the counsel who prepared his adjustment of status application, but I believe that's what he understood. And that's — he went to the interview believing that that was what would take place. But his application wasn't even accepted because they didn't review that or look at anything. They simply opened the file and said, you have an outstanding order of deportation and you've never left. And he said he had left, but they didn't — they just took him into custody. And then he had the photographs of his trip to Vancouver, which were dated, and that was why they — They shipped him out, huh? Well, they were ready to ship him out, but then they said, well — then they said, we made a mistake. We thought we were just going to execute an order of deportation. However, we're convinced that he has, in fact, as he said, reentered after deportation. But we don't have to look at the adjustment application anyway because we're just going to reinstate the prior order. So we're going to correct our error, but we're not going to go back and look at the application, which — he would have had an interview, but for the fact that they thought there was a prior order of deportation, which had never been executed. Okay. Thank you. Thank you. Can we take a break? You're going to take a short break. All right.
judges: Pregerson, Beam Paez